**UNITED STATES of America, Plaintiff,**

v.

**Roderick S. PIPES, Defendant.**

**No. 4:95CR3031.**

United States District Court,
D. Nebraska.

Oct. 20, 1998.

Thomas J. Monaghan, United States Attorney, Bruce W. Gillan, Assistant United States Attorney, District of Nebraska, Lincoln, NE, for Plaintiff.

Michael J. Hansen, Berry, Kelley Law Firm, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter comes before me upon the mandate of the United States Court of Appeals for the Eighth Circuit ordering me to conduct an evidentiary hearing on the defendant's motion to compel the government to file a motion for downward departure under § 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e) (substantial assistance to authorities). Pursuant to the order of the Court of Appeals, I have conducted an evidentiary hearing that spanned two days. I now deny Roderick S. Pipes' motion because the government's refusal to file the departure motion was rationally related to a legitimate governmental objective and Pipes was not truthful. My reasons for this decision are set forth below.

## I. BACKGROUND

I will first describe the procedural history of this case. I will then discuss the evidence presented to me at the evidentiary hearing.

### A. Procedural History

Together with LaSalle N. Waldrip (Waldrip), Roderick S. Pipes (Pipes) was indicted in the United States District Court for the District of Nebraska for possession with intent to distribute 50 grams or more of a substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1). The offense was alleged to have taken place on April 6, 1995. The facts that gave rise to the indictment are set forth below.

On April 6, 1995, a Nebraska State Patrol trooper received a message from the Utah State Patrol that described two vehicles. The message stated that the occupants had "known gang associations" and advised law enforcement to "investigate transportation controlled substance" and "make own case." The Nebraska trooper estimated when the two vehicles would arrive and began to watch for the cars.

Early the next morning, the trooper saw two vehicles that matched the description in the message. He verified by radar that the first car was speeding and observed that the other one was following at a constant speed. The trooper asked for the assistance of a Lancaster County, Nebraska, deputy sheriff.

The county sheriff responded and informed the trooper that the two vehicles had been clocked for speeding and that the sheriff had seen the message regarding possible narcotics trafficking. The deputy sheriff stated that he would stop the first car, and he instructed the trooper to stop the other vehicle.

The second vehicle was occupied by Pipes and Waldrip. The trooper activated his lights and sirens and shined his spotlight into the car. Pipes and Waldrip raised their hands and shrugged their shoulders, but did not stop. The trooper observed Waldrip lean out the passenger side window and throw four bags containing a white substance. Nearly a half mile later, Pipes and Waldrip pulled over. After the passengers exited the car, the trooper saw a bag containing what proved to be crack cocaine in the driver's console and a piece of rock cocaine on the floor board in front of the passenger's seat.

After unsuccessfully moving to suppress the evidence, Pipes and Waldrip pled guilty. As a part of the plea agreement, Pipes and Waldrip agreed to cooperate with the government and the government agreed to consider filing a motion for downward departure if the men provided substantial assistance to the prosecution.

Pipes and Waldrip gave the Nebraska State Patrol a proffer regarding their knowledge of illegal activities within Nebraska. They also later met with an FBI agent who was investigating a large crack cocaine conspiracy in the western district of Oklahoma. Essentially, Pipes told the investigators that he had been told by Waldrip that the men were taking the crack to Oklahoma and that the crack belonged to the driver of the first vehicle, Akale Green (Green).

The information regarding Green was of interest to the federal prosecutors in Oklahoma because he was a suspect in a large crack conspiracy in that state. Accordingly, after Pipes and Waldrip implicated Green, the Oklahoma prosecutor requested on May 23, 1996, that Pipes' Nebraska sentencing be delayed so he could be interviewed and testify against Green in Oklahoma.

However, Green later signed a plea agreement with the Oklahoma authorities and gave them a statement. Regarding the Nebraska trip, Green told the authorities that three men were traveling to Omaha, Nebraska, that the drugs belonged to Waldrip, that Green had agreed to help sell the drugs in Omaha, and that the men were not going to Oklahoma.

Despite the earlier request to delay sentencing, Pipes was not called to testify in Oklahoma against Green or anyone else. In addition, since Green was not charged here, Pipes did not testify against him in Nebraska either. Nevertheless, as a result of his cooperation, Pipes believed that he was entitled to a motion for downward departure. The government, relying upon advice from an assistant United States attorney in the western district of Oklahoma, refused to file the

motion, contending that Pipes had not been truthful regarding Green.

The motion to compel the government to file the motion for downward departure was submitted to me upon affidavits. I concluded that Pipes had not made a sufficient threshold showing that the government's refusal to file the motion was based upon an unconstitutional motive or that the refusal was irrational. *United States v. Waldrip,* 948 F.Supp. 908 (D.Neb.1996).

On appeal, the United States Court of Appeals disagreed and reversed. *United States v. Pipes,* 125 F.3d 638 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1202, 140 L.Ed.2d 330 (1998). The Court of Appeals reasoned that because Pipes had given information that appeared to be potentially helpful to the government about Green and there was evidence that the Oklahoma prosecutor had made a "drastic change in position, and refused to move for a downward departure[,]" I should have held an evidentiary hearing. The Court of Appeals stated:

> Under these circumstances, particularly the lack of any concrete explanation for the Oklahoma prosecutor's decision, the district court should have conducted an evidentiary hearing to determine whether the Nebraska prosecutor's failure to file a downward-departure motion was irrational. Thus, we reverse Pipes' sentence and remand for an evidentiary hearing on the question of whether Pipes had, in fact, been untruthful in his dealings with the Oklahoma prosecutor.

*Id.* at 641–42.

## B. Facts

I will summarize the evidence that was presented to me at the evidentiary hearing. I proceed to that task next.

### 1. Defendant's Evidence

Pipes began his presentation of evidence by offering to stipulate that Green had not been charged in Nebraska for the crack cocaine crime that formed the predicate for Pipes' conviction. The government so stipulated. (Tr. 54–55.) Pipes also offered other evidence which is summarized below.

## Pipes' Testimony

Pipes took the witness stand. Basically, he described what led up to his arrest. Then he described what he had told law enforcement officers after he began to cooperate.

Pipes testified that he was released from prison in California on March 25, 1995, whereupon he made contact with Waldrip. (Tr. 58–59.) Pipes had known Waldrip before going to prison and considered Waldrip a friend. (Tr. 59.)

When Pipes went to Waldrip's home in San Bernardino, California, Waldrip introduced Pipes to Jamal Green, also known as "Spook Green." (*Id.*) Jamal Green, also known as Spook Green, was further known as Akale Green. (*Id.*)

According to Pipes, "Waldrip asked me, did I want to go to Oklahoma with him and Green, and he was gonna pay me some money to ride with him to keep the police up off of him." (Tr. 60: 2–4.) Pipes understood that the reason he was going with Waldrip was "to keep the police off of Green because his tags wasn't up-to-date." (Tr. 60: 12–13.) Waldrip was going to pay Pipes two hundred dollars. Waldrip told Pipes he was receiving five hundred dollars from Green. (Tr. 60.)

Shortly thereafter, Pipes and Waldrip left San Bernardino driving a 1994 Nissan Stanza. (Tr. 61.) Green, Green's girlfriend, Cheryl Tucker, and her two children rode with Green in a Cadillac. (*Id.*) While the two cars were proceeding east together, Green was pulled over in Utah by a trooper. (Tr. 62.) Waldrip and Pipes stopped to help Green if they could. (*Id.*)

The trooper missed the crack cocaine that Green was carrying. While the search was proceeding, Green removed the children, some clothes, and a bag from the car. The children, the clothes, and the bag were then transferred to the car driven by Pipes and Waldrip. (Tr. 63.) According to Pipes, the bag had crack cocaine in it. (*Id.*) With the crack safely out of Green's car, the two cars proceeded to Nebraska.

Pipes testified that near Lincoln, Nebraska, a police car began to follow the car that Waldrip and Pipes occupied. (Tr. 64.) With Pipes driving, Waldrip began to throw the

drugs out of the car. (*Id.*) As previously indicated, Pipes and Waldrip were arrested near Lincoln, Nebraska, on April 6, 1995. (Tr. 65.)

On approximately December 21, 1995, Pipes had the opportunity to speak to an agent of the Nebraska State Patrol and tell the agent what had happened. (*Id.*) Pipes testified that he told an agent of the Nebraska State Patrol essentially what he had stated at the evidentiary hearing. (Tr. 66.) He testified that Green had never told him that the men were going to Omaha, Nebraska, to sell the crack cocaine. (*Id.*) Pipes admitted, however, that he did not have extensive conversations with Green. (Tr. 67–68.) Pipes told the investigator that he thought they were going to Oklahoma. (Tr. 68.) Pipes believed he was going to Oklahoma because Waldrip told him that was the destination. (*Id.*)

Pipes further testified that he spoke with an FBI agent at the prison in Leavenworth, Kansas, at some time later. (Tr. 69.) According to Pipes, he told the agent essentially what he said at the evidentiary hearing. (*Id.*)

Pipes further testified that he believed he told the law enforcement officers everything he knew. (Tr. 72.) He added that his cooperation had caused him to have problems in prison, such as having "a rat jacket on [me]." (Tr. 73: 9–11.)

Pipes was vigorously cross examined by government's counsel. Essentially, government's counsel implied that Pipes and Waldrip had been carrying the drugs, and not Green. (Tr. 74–84.) The government pointed out the implausibility of the Utah trooper not finding the crack cocaine if it was truly in Green's car. For example, after searching Green's car with a drug dog, the trooper was able to locate a small amount of marijuana. (Tr. 75.)

On cross examination, Pipes also admitted that he learned from Waldrip, shortly after the stop in Utah, that "Green wanted to go to Omaha because Omaha was close to Oklahoma City. Then he's going to Oklahoma City." (Tr. 87: 13–17.) This was a change in plan because when the men left San Bernardino, Pipes "thought we was going to Oklahoma." (Tr. 87: 20–21.)

Pipes admitted that he did not testify at trial or before a grand jury regarding the information he possessed. (Tr. 93.) Pipes also admitted that he gave only two statements to the government, one to the State Patrol and one to the FBI agent. (*Id.*)

On redirect examination, Pipes stated that the government had asked him to testify against Green in the Oklahoma City case and that he had agreed to do so. (Tr. 95–96.) However, that testimony became unnecessary because of Green's decision to plead guilty in Oklahoma. (*Id.*)

### His Lawyer's Testimony

John Stevens Berry was also called to testify. (Tr. 104.) Berry is one of the lawyers who represented Pipes. (Tr. 105.)

In the winter of 1995, probably in December, Berry testified that he met with at least one of the prosecutors at the Lancaster County jail in the booking area. (*Id.*) Together with Berry, Pipes, Waldrip, Waldrip's lawyer, and Bruce Gillan, an Assistant United States Attorney, were present. (Tr. 106.) The subject of the conversation was whether Pipes and Waldrip had information they could give the government which might in turn assist them for sentencing purposes. (*Id.*)

According to Berry, he asked Gillan a series of questions regarding what would happen if his client agreed to cooperate, but Gillan's superiors sabotaged the agreement. Berry's testimony about Gillan's response is set forth below:

Q Thank you, Your Honor. Mr. Berry, during that particular conversation which you have just been testifying about, was there a statement by Mr. Gillan regarding a downward departure?

A Yes.

Q What was that statement?

A I asked Mr. Gillan what if we, he and I, in good faith entered into an agreement; my client, in good faith, told everything he knew, and then the people from Omaha decided not to keep our agreement.

Q What do you mean by the people from Omaha?

A Well, I was aware of the fact that the office of the United States Attorney was in Omaha, and I was aware of the fact that there has been some changes since Mr. Lahners had been the United States Attorney. Generally, he always let people keep the agreements they made. It was my understanding that there was at least the possibility that somebody in Omaha might, to use my language, sabotage an agreement, so I asked Mr. Gillan what if he and I entered into an agreement in good faith, my client cooperated in good faith, said everything he knew, and somebody in Omaha—excuse me— decided to sabotage the agreement, and Mr. Gillan smiled at me and he said, if your client makes his proffer, you'll have to trust me. You'll get your motion for downward departure, and I believed him, and we went ahead with that.

Q Did you rely on the information provided by Mr. Gillan at that time?

A Yes, I did.

Q And did your reliance on that information cause you to advise Mr. Pipes on how you felt he should proceed in his best interests?

A Yes.

Q What was your advice?

A My advice to Mr. Pipes was to tell the Government everything he knew.

Q And to your knowledge, did he do that?

A It's my understanding he did.

(Tr. 110: 4–111: 16.)

On cross examination, Berry admitted that Gillan had given him "assurances that if *helpful* information was provided, that a downward departure would be made." (Tr. 120: 11–121: 11 (emphasis added).)[1] Berry was then shown Pipe's petition to enter a plea of guilty and the attached plea agreement. (Tr. 124 & filing 68 (sealed).) The plea agree-

ment was dated January 12, 1996. (*Id.*) The plea agreement was signed by Pipes, Berry, and Gillan. (*Id.*)

Berry admitted that the petition and plea agreement, which had been signed after Berry's alleged conversation with Gillan, stated that there were no promises, agreements, or conditions that had been entered into except for those set forth in the documents. (Tr. 126; Filing 68 (sealed) (petition to enter plea of guilty ¶¶ 38–39) (plea agreement ¶ 10).) Berry also admitted that the "only assurance I had that there would be a motion for downward departure was made orally to me by Mr. Gillan" and that assurance was never "set forth in the court-affiliated documents." (Tr. 127: 15–18.)

The government's written promise about a substantial assistance departure motion was limited. It promised only that: "Any cooperation provided by you will be considered by the government under Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e)." (Filing 68 (sealed) (plea agreement ¶ 5B).)

On redirect examination, Berry stated that the plea agreement authorized the government to require Pipes to submit to a polygraph examination. (Tr. 128.) To the best of Berry's knowledge, the government never asked Pipes to undergo a polygraph test. (*Id.*)[2]

### Waldrip's Sentencing Transcript

Next, Pipes offered into evidence the sentencing transcript of Waldrip, and the court took judicial notice of it. (Ex. 102.) Counsel for Pipes stated that the transcript was relevant because the prosecutor in that case "acknowledged that [Waldrip] did cooperate to a certain degree, and secondly, that [the prosecutor] acknowledged that the Government proposed a three-point reduction to Mr. Waldrip's base offense level on account of a mitigating role in the offense." (Tr. 132: 2–6.) Counsel therefore suggested that the

---

1. The government also pointed out that Berry had used the phrase "helpful information" in the motion to compel the government to file a motion for downward departure. (Ex. 2.)

2. I asked Pipes' counsel whether the defendant wished to rely upon the plea agreement or

whether Pipes now wanted to be relieved of the terms of the plea agreement. (Tr. 130.) After a recess, Pipes, through his counsel, stated that he did not want to withdraw his plea and he wished to be bound by and have the benefits of the plea agreement. (Tr. 130–131.)

government's position (that Green is telling the truth and that Pipes and Waldrip are not) was inconsistent.

### Waldrip's Refusal to Testify

Although Pipes subpoenaed Waldrip, he was unable to obtain corroboration from his codefendant. Pipes' lawyer informed me that:

> We had subpoenaed LaSalle Waldrip to testify in this matter, and he is in the jurisdiction. For the purpose of the record, I would just like to state that we, in good faith, did subpoena LaSalle Waldrip to testify here today ... LaSalle Waldrip, if called to testify, would exercise his Fifth Amendment privilege against self-incrimination, and that is the reason we're not calling LaSalle Waldrip this morning. (Tr. 133: 25–134: 9.)

With that, the defendant rested.[3]

### 2. The Government's Evidence

The government's evidence consisted of testimony of an Oklahoma prosecutor, a Nebraska prosecutor, and an Oklahoma FBI agent. The government also presented documentary evidence.[4]

### The Oklahoma Prosecutor's Testimony

The government called Leslie Maye to testify. (Tr. 15.) Ms. Maye, an Assistant United States Attorney for the Western District of Oklahoma, has been a prosecutor for about 15 years. (Tr. 16.)

Maye was assigned to the Oklahoma conspiracy investigation which began in the fall of 1994. (Tr. 15–16.) The investigation involved the "Main Street Mafia Cryp" gang. (Tr. 16.) Law enforcement authorities became aware that the gang had come to Oklahoma City from Los Angeles and was selling crack cocaine in the area. (Tr. 17.)

The trial of the conspiracy case began in September of 1996. (*Id.*) During that trial, Maye wrote Special Assistant United States Attorney Richard Rothrock of the District of Nebraska. (*Id.*) She wrote that she "could

not support a motion for downward departure for Mr. Waldrip and Mr. Pipes." (*Id.*) In order to explain the reasons for this letter and her earlier letter of May 23, 1996, requesting a delay in Pipes' sentencing, Maye explained the investigation and prosecution of the Oklahoma conspiracy.

In the spring of 1996, a complaint was filed in Oklahoma. Green and others were arrested shortly thereafter. An indictment followed on July 3, 1996. Green also began to cooperate on July 31, 1996. The complaint and indictment were based upon extensive wire tap surveillance.

Maye testified that the conspiracy involved the transportation of powder cocaine from Los Angeles to Oklahoma City. (Tr. 20) Once the powder cocaine arrived in Oklahoma City, it was turned into crack cocaine. (*Id.*) The conspiracy involved multi-kilogram quantities. (*Id.*) The crack cocaine was distributed from a particular "crack house" in Oklahoma City. (Tr. 20–21.) The sales normally occurred in a section of Oklahoma City known as the "trenches." (Tr. 21.)

Insofar as Green was concerned, Maye testified that prosecutors were aware of his involvement because of the wiretaps. (Tr. 19.) After Green began to cooperate with the Oklahoma City prosecutors, he told them that he became involved in the Oklahoma City conspiracy in the fall of 1994. (Tr. 22.) He stated that he left the conspiracy in December of 1994. (*Id.*) Maye was able to confirm Green's statement through another coconspirator. (*Id.*)

Green also explained his reason for leaving the conspiracy. He informed the prosecutors that at one time there was approximately $75,000 to $85,000 in drug proceeds stored at a particular house in Oklahoma City. (Tr. 23.) Some of the money turned up missing. (*Id.*) The other coconspirators suspected Green. (*Id.*) One of the members of the conspiracy was dispatched to find Green. (*Id.*) According to Green, they found him in the "trenches" and brought him back to the home. (*Id.*)

---

**3.** Also, the court took judicial notice of the court file at Defendant's request. In addition, the court received into evidence a proffer agreement between Pipes and the government. (Ex. 101.)

**4.** In addition to the documentary evidence described in the text, the government also presented the notes from Pipes' interview with the Nebraska Highway Patrol. (Ex. 1.)

Green stated that he was taken to a back bedroom at gun point, stripped, and searched. (*Id.*) The other coconspirator talked of killing him. (*Id.*) Green was held against his will and threatened for approximately four to five hours. Thereafter, they freed him, and he quickly left the Oklahoma City area for Los Angeles. (*Id.*)

Two other individuals confirmed Green's statements. (Tr. 24.) They told investigators that "there was no way that [Green] would be accepted back to Oklahoma City, and that potentially, he was in physical harm and danger back in Los Angeles." (Tr. 24: 17–19.) Maye testified that so far as her investigation was able to discover, Green had no further involvement in the Oklahoma conspiracy after December of 1994. (Tr. 24–25.)

The Oklahoma City prosecutor also spoke with Green about his involvement with Pipes and Waldrip. (Tr. 25.) Green told the prosecutor that while he was in California, he was dating a girl from Nebraska. (*Id.*) He knew he could not return to Oklahoma. (*Id.*) He talked to Waldrip, whom he had known before, and he and Waldrip decided to go to Nebraska. (*Id.*) Green told the investigators that Waldrip had the crack, and that Green agreed to assist in the distribution of Waldrip's crack cocaine in Omaha. (Tr. 26.)

Maye also testified that she became aware that Pipes and Waldrip had made statements in Nebraska after their arrest that implicated Green. (*Id.*) Since Green was one of the targets of her investigation, she was interested in knowing what Pipes and Waldrip knew. (*Id.*) This was sometime in May of 1996 before Green began to cooperate. (Tr. 27.)

After the complaint was filed in Oklahoma City in the spring of 1996, the Oklahoma City prosecutors began to receive cooperation from various individuals. (*Id.*) Ultimately, only four individuals went to trial out of more than 20 who were indicted. (*Id.*) From these cooperating individuals, Maye found nothing that would indicate that Green was lying about anything he had told her. (Tr. 28.) Maye testified that nothing that Waldrip and Pipes provided was of any benefit to the government in the Oklahoma case. (*Id.*)

Maye decided that the Nebraska incident was unrelated to the Oklahoma conspiracy. (Tr. 28–29.) Green would never have returned to Oklahoma given the death threats over the missing money. In addition, she had other reasons for her conclusion that the Nebraska incident was unrelated to the Oklahoma conspiracy.

For example, the Oklahoma conspirators knew the difference in penalty for powder cocaine versus crack cocaine, and thus they did not transport cocaine in crack form to Oklahoma City. In contrast, the Nebraska transaction involved the transportation of crack, something the Oklahoma conspirators would not have done. (Tr. 29.)

While Waldrip suggested that the crack cocaine was Green's and Green said the crack belonged to Waldrip, Maye learned from other witnesses in California that Green would not have had the connections in California to obtain crack cocaine. (*Id.*) This was because he was not safe to be around as a result of the missing money in Oklahoma City. (*Id.*)

Furthermore, Maye stated that after Green left Oklahoma City, he was not picked up on the wiretaps. (Tr. 30.) Waldrip and Pipes were never picked up on the wiretaps either. (*Id.*) Pipes could not identify anyone in the Oklahoma City organization from photos and he could not give physical descriptions about anyone in the Oklahoma organization. (Tr. 30–31.) Thus, there was no corroboration that Green was intending to resume drug dealing in Oklahoma.

For all of these reasons, Maye concluded that the Oklahoma City conspiracy "did not involve in any way the crack cocaine in Nebraska." (Tr. 31: 2–3.) Although Maye wanted to connect the Nebraska crack cocaine with the Oklahoma City conspiracy, "it did not tie up." (Tr. 31: 5.) "It was therefore not indicted, and therefore their information was of no assistance to us." (Tr. 31: 6–7.)

On cross examination, Maye confirmed that she had written a letter to Rothrock regarding the sentencing of Pipes. (Tr. 32.) She wrote this letter on May 23, 1996. (*Id.*) At that time, Green was not cooperating and "Mr. Pipes's information needed to be inves-

tigated and looked at in conjunction with what we were looking at in Oklahoma City to determine what its value was." (Tr. 33: 1–4.) As a result, "we did ask that they put off the sentencing so that could be determined." (Tr. 33: 4–5.)

Green did not begin to cooperate with the Oklahoma City prosecutors until July of 1996. (Tr. 33.) During the interview with Oklahoma City prosecutors, Green admitted that he was involved in the transportation of crack cocaine from California to Nebraska, and that he was going to help distribute the crack cocaine in Omaha, Nebraska. (Tr. 34.)

At the request of defense counsel, Maye identified certain inconsistencies that she saw in statements Pipes had given to the Nebraska state troopers and to the FBI agent. (Tr. 36.) During the first statement, Pipes said there was a bag, but he did not know what was in it. (*Id.*) When the Oklahoma FBI agent spoke to Pipes, Pipes was able to identify what was in the bag as illegal drugs. (*Id.*) Moreover, during the initial interview with the Nebraska Highway Patrol, Pipes did not refer to Green. Later, when speaking with the FBI agent, Pipes stated that Green provided $500 in cash to Waldrip and Waldrip gave Pipes less money than was actually seized at the time of the Nebraska arrest. (Tr. 36–37.)

Maye also testified on cross examination that the Oklahoma prosecutors entered into a plea agreement with Green without taking a proffer interview first. (Tr. 38.) However, Maye stated that the plea agreement did not provide for a substantial assistance motion for Green. (*Id.*)

Maye testified that she did not believe the testimony of Waldrip or Pipes persuaded Green to sign a cooperation agreement with the Oklahoma authorities. (Tr. 39.) This was because the Oklahoma authorities knew "from th[eir] investigation what his role was, and so he was willing to talk to us about that information." (Tr. 39: 20–21.)

As for Green's involvement in the Nebraska crime, Maye again testified that Green admitted that he was willing to assist Waldrip in the distribution of crack cocaine in Nebraska. (Tr. 40.) However, Green told a different story than Pipes and Waldrip in other respects. (Tr. 41.) In particular, Green insisted that "he was never going to Oklahoma." (Tr. 41: 11–12.)

Maye testified that she believed Green rather than the statements of Pipes and Waldrip because the Oklahoma prosecutors "did have other witnesses that tend[ed] to make his story more credible than that offered to us by Waldrip and Pipes." (Tr. 42: 18–20.) In particular, Maye did not believe Green would return to Oklahoma City because of the death threats and because the Main Street Mafia Cryps would not do business with Green given the dispute over the missing money. (Tr. 42–43.)

Maye also testified that the Oklahoma City probation office was apprised of Green's activities in Nebraska. (Tr. 44.) However, "they did not see it as a continuing course of conduct" and therefore the Nebraska activity was not used as relevant conduct in Green's Oklahoma sentencing. (Tr. 44: 20–21.)

Maye further testified that she wrote the letter in May of 1996 requesting that Pipes' sentencing be continued to provide Pipes with "an incentive to keep going in his cooperation and potentially cooperating against Mr. Green." (Tr. 44: 24–45: 2.) However, Maye clarified that she also wrote the letter because "we had not had a chance to talk to [Pipes]." (Tr. 45: 3–4.)

On redirect examination, Maye confirmed that her opinion about the usefulness of Pipes' information changed between May and September of 1996. (Tr. 49.) Essentially, after she had weighed all of the information, including the statement from Green which was not available to her when she wrote the first letter, Maye concluded that the information from Pipes and Waldrip did not amount to substantial assistance. (*Id.*)

On examination by the court, Maye stated that Green did not receive the benefit of a motion for downward departure in Oklahoma. (Tr. 49–50.) Maye also testified that she did not ask the authorities in Nebraska "to go easy on Green." (Tr. 50:16–25.) Moreover, she understood from the Nebraska authorities that they did not prosecute Green in Nebraska because those authorities

thought the drugs did not belong to Green. (Tr. 50: 21–25.)

On redirect examination by the government, Maye stated that Green pled guilty to a "travel count" in Oklahoma. (Tr. 51.) He had been charged in the original indictment with a conspiracy involving multiple kilograms of crack. (Tr. 52.)

Moreover, with three exceptions, Maye testified there was no evidence directly linking Green to the drugs in Nebraska. Those three exceptions were: (1) Green's statements; (2) the statements of Pipes and Waldrip; and (3) the fact that Green was present on the highway somewhere in the vicinity of where Pipes and Waldrip had been stopped. (Tr. 52.)

### A Nebraska Prosecutor's Testimony

The government called Bruce Gillan, one of the Nebraska prosecutors assigned to this case. (Tr. 134.) Gillan agreed that he had a conversation with Berry on December 21, 1995. (Tr. 136.)

According to Gillan's recollection, the conversation took place when Waldrip and Pipes were making proffers. (Tr. 138.) As Gillan remembered, "it was at the end of the proffer interview process that day and we were getting ready to leave, and I very vividly remember Mr. Berry talking to me about Mr. Monaghan." (Tr. 138: 17–20.) Gillan did not believe that Pipes or Waldrip were present, because it was not the policy of the jail to have inmates freely walking around in the booking area. (Tr. 138.)

According to Gillan, "Mr. Berry started off by in his colorful way telling me that he had heard bad things about Mr. Monaghan and motions for downward departure, and [I] recall coming to Tom Monaghan's defense and saying, Steve, I think you're hearing rumors from disgruntled defense counsel." (Tr. 139: 8–12.)[5] Gillan went on to:

> recall [Berry] talked about Ron Lahners who was the United States Attorney before Mr. Monaghan was appointed, and the good old days, that sort of thing, and I told him that my experience was that if people complied with the agreements, told the truth and didn't commit any crimes, that

there was no real difference, and I recall saying, if your client cooperates with us and provides helpful information, we'll move for downward departure just like in every other case you have had. This is not some sea change with Mr. Monaghan.

(Tr. 139: 15–24.)

Gillan testified that his statements to Berry were not given as an incentive for Pipes to enter into a proffer agreement or a plea agreement. (Tr. 140.) Indeed, according to Gillan, the statement took place after the proffer statements by Pipes. Their exchange was an afterthought: "[It] was just a conversation that Steve Berry initiated as we were standing in the booking area getting ready to leave." (Tr. 140: 17–19.)

Gillan specifically testified that he told Berry that Pipes' statement "had to be of assistance or helpful." (Tr. 141: 6–13.) The mere fact that Pipes had given a statement would not be sufficient. (*Id.*)

Gillan concluded his direct examination by stating that he had negotiated "hundreds" of plea agreements. (Tr. 142: 9.) According to Gillan, he had been an Assistant United States Attorney or a special Assistant United States Attorney for 15 years. (Tr. 142.)

On cross examination, Gillan said it was possible he had this conversation with Berry prior to the proffer interview commencing. (Tr. 145.) While that was possible, Gillan did not think it was probable. (Id.)

Gillan testified that he was not involved in the decision about whether to file a motion for downward departure. (Tr. 145–146.) After Gillan's conversation with Berry, Mr. Rothrock handled the case for the government. (Tr. 146.) It was only after the case had been reversed and remanded that Mr. Gillan was assigned to handle the Pipes case again. (*Id.*)

I asked Gillan whether he believed what he had said to Berry was inconsistent with the plea agreement that was ultimately signed. Gillan responded in this way:

> No, I don't, because the gist of what I said was, you are not getting the full story

---

5. Tom Monaghan is the United States Attorney for the District of Nebraska.

about people that are not getting motions for downward departure. Those people violated their agreements by committing crimes or not telling the truth, and so that the gist of the conversation was that if you comply with the agreement and your cooperation is substantial, then Tom Monaghan is not going to argue about—he's not going to balk at filing a motion for downward departure.

(Tr. 147: 1–9.)

Gillan further testified in response to my questions that the tenor of his conversation with Berry was not about the meaning of substantial assistance. (Tr. 147.) On the contrary, the tenor of his conversation with Berry was whether there had been a change in policy resulting from Tom Monaghan's appointment as United States Attorney. (*Id.*)

On further examination by government's counsel, Gillan stated that he never made any commitment to Berry that Pipes' statement on that day amounted to substantial assistance. (Tr. 149.) As a matter of fact, Gillan stated: "I don't believe that I would ever say that because our office policy at the time, and still is, that I don't have authority to agree that we will do that, and so I would not have done that." (Tr. 149: 10–13.)

### The Testimony of the Oklahoma FBI Agent

The next witness to testify for the government was Dylan G. Burns, an FBI agent. (Tr. 152.) Burns had been an agent for seven years at the time he testified, and he had been a police officer for ten years prior to joining the FBI. (*Id.*) Burns is assigned as a team leader to a surveillance group in Oklahoma City. (*Id.*) In his capacity as an FBI agent, Burns investigated a conspiracy in Oklahoma and the potential involvement of Pipes, Waldrip, and Green. (Tr. 153.)

This investigation began in the latter part of 1994 when he and local police began to investigate the "Main Street Mafia Cryps who had shown up in Oklahoma City ... from Los Angeles...." (Tr. 154: 4–6.) The investigation involved a crack cocaine conspiracy. (Tr. 154.) Ultimately, the investi-

gation led to the indictment and conviction of 34 people on 99 different counts. (*Id.*)

As a part of that investigation, Burns had the opportunity to interview Pipes and Waldrip. Pipes' interview occurred in June of 1996. (*Id.*)

Burns learned of Pipes because of a contact from the Utah authorities. An Oklahoma City detective received a report from a highway patrolman in Utah that there had been a questionable stop involving a vehicle bearing an Oklahoma license plate and the individual involved was referred to as Jamar Green. (Tr. 155.) The Oklahoma City detective followed up, and ultimately ended up speaking with investigators in Lincoln, Nebraska. (*Id.*) The Oklahoma City detective learned that Jamar Green, who was known to the Oklahoma investigators as Akale Green, was traveling with Pipes and Waldrip and had been stopped in Utah and again in Nebraska where Pipes and Waldrip were both ultimately arrested. (*Id.*) Since Green was part of the investigation that the Oklahoma investigators were pursuing, Burns decided to interview Pipes and Waldrip. (*Id.*)

By the time Burns spoke with Pipes, the agent had already interviewed Waldrip. (*Id.*) Both of the interviews took place in Leavenworth, Kansas, at the correctional institution. (Tr. 156.) The Pipes interview took place approximately two weeks after the Waldrip interview. (*Id.*)

Waldrip told Burns that he had known Akale Green from San Bernardino, California. (*Id.*) According to Waldrip, Green had asked him (Waldrip) to follow Green to Oklahoma City. (*Id.*) According to Waldrip, Green wanted Waldrip to "basically block for him in case there was some kind of problem with the police." (Tr. 156: 19–21.)

When Burns spoke with Pipes, Pipes told Burns essentially what Waldrip had told Burns. (*Id.*) Pipes indicated that "he did not really know Akale Green, but he did know Waldrip, and that he was asked by Waldrip to go along on this trip. He would make a little bit of money for just riding along, and they would be able to get out of town for a while." (Tr. 156: 25–157: 4.)

Burns questioned the veracity of Pipes and Waldrip. (Tr. 158.) He wondered "how anyone could think that they were going to ... Oklahoma via Utah, Colorado, [and] Nebraska." (Tr. 158: 11–13.)

After Burns had completed the interviews with Pipes and Waldrip, he conferred with the prosecutors in Oklahoma. (*Id.*) The Oklahoma indictment was not presented until July 3, 1996. "[W]e came to the conclusion that because of the separation of the activity from Oklahoma, the fact that this appeared to be, if Akale Green was involved separate from the Main Street Mafia organization that was operating in Oklahoma City, that it would probably not be appropriate for us to apply it in our indictment of the conspiracy we were looking at in Oklahoma City." (Tr. 158: 20–159:2.)

The investigation in Oklahoma City also involved interviewing Green. (Tr. 160.) Green had agreed to cooperate with the law enforcement authorities in Oklahoma City, and also told them about the stops in Utah and Nebraska involving Pipes and Waldrip. (*Id.*) Green gave his statement to Burns after he had signed a plea agreement with the government which shielded him from prosecution for statements given the government regarding other crimes. (Tr. 169; Ex. 3.) This debriefing took place on or about July 31, 1996. (Tr. 161.)

At the debriefing, Green told the investigators that he was with Waldrip and Pipes, that he had been planning to go to Omaha, Nebraska, that he had talked about this with Waldrip, that Waldrip wanted to get out of town and make some money selling drugs, and that Green had told Waldrip that he thought there would be a good market for drugs in Omaha. (Tr. 162.)

Burns came to the conclusion that Green's statements were likely true, and the statements of Waldrip and Pipes were likely false. (Tr. 167.) Essentially, Burns had two reasons for this conclusion. (*Id .*)

First, Green, fearing for his life, had a very good reason not to return to Oklahoma, and thus the statements of Pipes and Waldrip were unusually suspect. As Maye had also recounted, Burns described Green's statement about the missing money and his near escape from death in Oklahoma. Green gave Burns a detailed account about the death threats he received in Oklahoma City and his concern for his safety in California given the presence of other angry Main Street Mafia members in that state. Thus, "there was no reason for him to ever want to go back to Oklahoma City in the immediate future." (Tr. 167: 19–20.) Green's story was corroborated by at least two other people who were present during the time that Green was held at gunpoint in Oklahoma City. (Tr. 167.)

Second, the Oklahoma City investigation was not able to corroborate a link between Nebraska and Oklahoma. (Tr. 168.) On the contrary, unlike the Nebraska incident, the Oklahoma City drug ring never transported crack cocaine, but instead transported powder cocaine and turned it into crack upon arrival in Oklahoma. (Tr. 163.)

Burns testified that none of the information that Waldrip and Pipes gave was used for the prosecution of any individuals in the Main Street Mafia conspiracy. (Tr. 168.) According to Burns, "we didn't feel that it applied or was of any use in our particular conspiracy investigation." (Tr. 168: 13–14.)

On cross examination, Burns admitted that when he first took information from Waldrip, it "appeared he was giving information about Akale Green that would be helpful, possibly, in a prosecution" and that Burns expressed this feeling to Waldrip's lawyer. (Tr. 171: 14–22.) Burns also stated that he thought that Pipes was cooperative and "didn't hedge," but "he acted like he didn't know anything, that he was just minimally involved." (Tr. 172: 22–173: 1.)

On cross examination, Burns stated that approximately a month after the interviews with Pipes and Waldrip, Green decided to sign a plea agreement. (Tr. 174.) After Green agreed to cooperate, he was interviewed by various investigators, including Burns. (Tr. 175.) Green was not supplied with the "302s" involving Waldrip and Pipes at this time. (*Id.*)

During this interview, Green stated that he had told other Main Street members in Los

Angeles that he was going back to Oklahoma City. (Tr. 175–176.) Green stated that while he was in Los Angeles, he ran across Waldrip. (*Id.*) Green stated that during this time he was running from a charge in Oklahoma and that he was planning to go to Nebraska because he had contacts there. (*Id.*) He believed that the selling in Nebraska could be as good there as it was in Oklahoma. (*Id.*) Green said that he told Waldrip about the market in Omaha. (*Id.*)

Green told the investigators that Waldrip wanted to go with Green to Omaha. (Tr. 177.) Green told the investigators that they left in two cars. (*Id.*) Waldrip and another individual that Green did not know were in one car and Green was in another. (*Id.*) Green made it clear that his dealings on this trip were with Waldrip. (Tr. 178.) Green stated that he did not know where Waldrip got the drugs or where Waldrip hid them in his vehicle. (*Id.*) Green stated that the drugs belonged to Waldrip and that Waldrip had approximately nine ounces before leaving California. (*Id.*) By the time the men left for Omaha, Waldrip was down to only four ounces. (Tr. 179.)

Burns stated that while he knew that Green was admitting to a conspiracy with Waldrip to distribute crack cocaine in Nebraska, he did not forward that information to the Nebraska authorities. (Tr. 180.) Because of the provisions of the Oklahoma plea agreement, Burns believed "his statement couldn't be used against him." (Tr. 180: 14–15.) Green's plea agreement prohibits the government from using his statements "in any criminal case or criminal investigation" other than the Oklahoma charge. (Ex. 3, ¶ 4(b).)

Burns testified that the information he got from Green regarding the Oklahoma conspiracy was helpful. (Tr. 180–182.) In fact, Green testified against other people regarding the Oklahoma matter. (Tr. 182.)

On examination by the court, Burns testified that the Oklahoma case formally began when a complaint was filed in March of 1996. (Tr. 184.) Suspects were arrested at that time pursuant to warrants. (*Id.*) Green was arrested pursuant to the warrant issued out of Oklahoma while he was in jail in Nebraska. (*Id.*) At the time Green was arrested, Burns had not interviewed Pipes and Waldrip. (Tr. 185.) Green was arrested sometime in March or April of 1996. (*Id.*)

Burns stated that the information that Pipes and Waldrip gave him did not form any part of the basis for the March, 1996, complaint in Oklahoma. (Tr. 186.) None of the information provided by Waldrip and Pipes was given to the Oklahoma grand jury either. (*Id.*)

According to Burns, prior to Green's July, 1996, cooperation agreement, it was possible that Green, through Rule 16 discovery, received "302s" detailing the interviews of Pipes and Waldrip. (Tr. 188.) However, Burns also testified that the reason he thought Green decided to enter into a plea agreement was because "our case was very strong." (Tr. 190: 13–14.) Burns stated that: "We had the head of the organization ... already signed up on a plea agreement, and they knew that." (Tr. 190: 13–15.) The fact that the Oklahoma prosecutors had "somebody big in the Oklahoma organization" that could testify against Green and others was described in the indictment. (Tr. 190.)

Burns did not believe that the Oklahoma plea agreement barred Nebraska authorities from prosecuting Green. (Tr. 189.) Burns testified that there was no agreement between the Oklahoma authorities and the Nebraska authorities to refrain from prosecuting Green. (Tr. 191.) Green did not receive the benefit of a motion for downward departure in Oklahoma, and he was sentenced to serve five years in prison. (Tr. 192.)

On redirect examination, Burns told the government's counsel that Green never expressed "that he was pleading guilty because of information that you had gotten from Pipes and Waldrip." (Tr. 193: 4–8.) On the contrary, the conspiracy in Oklahoma involved between 16 to 18 kilos of crack cocaine that started out as powder and was converted to crack cocaine. (Tr. 193.) Thus, Green faced a very serious penalty in Oklahoma had he not cooperated with the government.

On recross examination in response to the court's question, Burns stated that he would

have brought up the Nebraska incident with Green even if Pipes and Waldrip had not cooperated. He knew about the incident because a Utah law enforcement officer had contacted Oklahoma authorities. (Tr. 194.) As Burns put it, "I knew all of the information from the Utah Highway Patrol and the Nebraska Highway Patrol." (Tr. 194: 20–21.) Burns would have known from the troopers that "there was a stop in Utah and some marijuana was found, and that there was a stop in Nebraska, and a number of drugs were found, but Green wasn't arrested." (Tr. 195: 12–15.)

## II. DISCUSSION

I will first address the two narrow issues presented by the remand. I will then address the remaining arguments raised by Pipes on remand.

### A. The Nebraska Prosecutor's Decision Was Rational

■ The Court of Appeals required "an evidentiary hearing to determine whether the Nebraska prosecutor's failure to file a downward-departure motion was irrational." *Pipes*, 125 F.3d at 642. In response, I find and conclude that the Nebraska prosecutor's failure to file a downward-departure motion was rationally related to a legitimate governmental objective. The information provided by Pipes was of no investigative or prosecutorial assistance in Oklahoma or Nebraska.

In particular, the information given by Pipes (and Waldrip) did not provide "substantial assistance in the investigation or prosecution of another person who has committed an offense." 18 U.S.C. § 3553(e). *See also* 28 U.S.C. § 994(n); U.S.S.G. § 5K1.1. Since Pipes' information was of no value in Oklahoma or Nebraska, the government's refusal to file the motion was rationally related to the legitimate purposes of the substantial assistance statutes and guidelines; that is, the government acts rationally when it refuses to file a motion for downward departure that is not authorized by the law. *See, e.g., United States v. Kelly*, 18 F.3d 612, 618–19 (8th Cir.1994) (defendant who signed

cooperation agreement and spoke with authorities was not entitled to substantial assistance departure motion where the defendant's "cooperation amounted to little more than naming one person in drug trafficking[,] ... [he] gave no information to aid in locating that person [and there were] inconsistencies in [his] statements.")

### 1. No Assistance In Oklahoma

What Pipes (and Waldrip) told the authorities did not substantially assist the investigation or prosecution of persons in the Oklahoma case. After the Oklahoma authorities had interviewed Pipes, Waldrip, and Green, they reasonably concluded that the Nebraska incident was unrelated to the Oklahoma incident. Consequently, they did not use the information provided by Pipes (and Waldrip). In the same vein, the Nebraska prosecutor, relying upon the Oklahoma authorities, acted rationally.

### a. After All the Facts Were Known, the Oklahoma Prosecutor's Decision was Rational

Remembering that the Oklahoma prosecutor did not have all the facts until after Green was interviewed,[6] the decision to treat the information provided by Pipes and Waldrip as insubstantial was based upon a rational assessment of the information. Despite what Pipes and Waldrip told the authorities, the Oklahoma prosecutor did not believe that the Nebraska incident was related to the Oklahoma investigation. Thus, the information provided by Pipes and Waldrip was of little value in Oklahoma. There are three reasons that support the conclusion that the prosecutor's assessment was rational.

First, to believe that the Nebraska incident was related to the Oklahoma conspiracy, one was also required to believe that Pipes, Waldrip, and Green were going to Oklahoma. However, Green had told the prosecutors that he was not returning to Oklahoma because he feared for his life. That Green had a well-founded fear for his life was substanti-

---

**6.** I specifically find that the Oklahoma prosecutor adequately explained her "drastic change in position." *Pipes*, 125 F.3d at 641.

ated by other cooperating individuals in the Oklahoma investigation. In addition, the route the men were taking from California to Utah to Nebraska was inconsistent with a trip to Oklahoma.

Second, the statements of Pipes and Waldrip that the drugs found in Nebraska belonged to Green rather than Waldrip were suspect. For example, Oklahoma authorities had learned that because of the earlier incident in Oklahoma, it was doubtful that Green could find a source of supply in California. If this were true, then the drugs likely belonged to Waldrip, as Green had stated, and they were unrelated to the Oklahoma conspiracy.

Also, it was clear that the Oklahoma conspirators did not transport crack cocaine. Nevertheless, the Nebraska incident involved the transportation of crack cocaine. Consequently, it was hard to believe that the Nebraska incident was related to the Oklahoma case, as Pipes and Waldrip suggested.

In addition, the story that Pipes and Waldrip told about the Utah trooper and his drug dog overlooking Green's crack cocaine was suspicious, particularly since the trooper found a small amount of marijuana. It was equally possible that the crack cocaine was in the car driven by Pipes and Waldrip at the time of the Utah stop. If so, this explained why the trooper did not find the drugs. And, if the drugs were really in the car driven by Waldrip and Pipes, it was probable that the drugs belonged to Waldrip and not Green. If the drugs belonged to Waldrip, then Green was telling the truth and the other men were lying.

Third, after Green fled Oklahoma, he was not overheard again on the wiretap. Pipes and Waldrip were never intercepted either. Aside from some talk in California that Green might return to Oklahoma, there was never any concrete evidence to show that Green continued to be involved in the Oklahoma conspiracy. Still further, there was never any evidence that Waldrip or Pipes was involved in the Oklahoma conspiracy. Consequently, the statements of Pipes and Waldrip that the men were going to Okla-

homa with the crack were highly suspect because there was no corroboration that Green was rejoining the conspiracy that he had previously abandoned in fear of his life.

#### b. No Proof that Pipes' Information Prompted Green's Cooperation

To the extent that Pipes argues that his information prompted Green to cooperate in Oklahoma, I find no evidence to support such an argument. On the contrary, the evidence reveals that the Oklahoma authorities had already secured the cooperation of one of the main targets of the conspiracy, and it was this cooperation, not the statements of Pipes and Waldrip, that caused Green to cooperate. As Agent Burns emphasized, "We had the head of the organization . . . already signed up on a plea agreement, and they knew that." (Tr. 190: 13–15.)

#### 2. No Assistance in Nebraska

Despite Pipes' contrary argument, the evidence does not support a finding that the information provided by Pipes and Waldrip could have been useful in the investigation and prosecution of Green in Nebraska. In essence, Pipes argues that even if his information was not valuable to Oklahoma authorities, the Nebraska authorities should and could have prosecuted Green in Nebraska based upon his help. For two reasons, this argument is not persuasive.

First, for good reason,[7] the prosecutors had serious doubts about whether Green had committed the possession offense for which Pipes and Waldrip had been convicted. As a result, the Nebraska prosecutors had an obligation to refrain from prosecuting him for that offense. United States Department of Justice, *United States Attorneys Manual* Tit. 9, Ch. 9–27.000, § 9–27.220 (Sept.1997) (Grounds for Commencing or Declining Prosecution) (stating that a prosecutor should commence a federal prosecution only when "he/she believes that the person's conduct constitutes a Federal offense. . . .").

Second, even if the government believed that Green was guilty of aiding and abetting

---

7. As noted earlier, the story told by Pipes and Waldrip (the crack belonged to Green, but it

ended up with Pipes and Waldrip during the Utah search) was implausible.

Pipes and Waldrip or engaging in an unfulfilled conspiracy, the government would have faced an insurmountable obstacle in a prosecution of him. The crack was observed in the car driven by Pipes and Waldrip, rather than the car driven by Green. There was no evidence to corroborate Pipes' and Waldrip's stories. Moreover, Green's statements to the Oklahoma authorities could not be used against him for the unrelated Nebraska prosecution because the Oklahoma plea agreement so provided. (Ex. 3, ¶ 4(b).) In short, the government would have been required to base its prosecution of Green upon the uncorroborated self-serving statements of two drug dealers with long criminal histories, and such an effort would have been a waste of time. Accordingly, the prosecutors had an obligation not to pursue the matter. United States Department of Justice, *United States Attorneys Manual* Tit. 9, Ch. 9–27.000, § 9–27.220 (Grounds for Commencing or Declining Prosecution) (stating that a prosecutor should commence a federal prosecution only "if ... the admissible evidence will probably will be sufficient to obtain and sustain a conviction....").

### B. Pipes Was Not Truthful

■ I was also instructed to decide "whether Pipes had, in fact, been untruthful in his dealings with the Oklahoma prosecutor." *Pipes,* 125 F.3d at 642. In response, I find and conclude that Pipes was not truthful. In particular, the men were not going to Oklahoma. Yet Pipes told Burns that he "believe[d][8] they were going to Oklahoma ... and they didn't have any idea that they were actually headed for Nebraska until they were halfway into the trip." (Tr. 157: 13–17.)

8. Pipes argues that even if what he told the authorities was not true, he based his statements upon what Waldrip told him and he subjectively believed the truth of Waldrip's statements. I reject this argument as irrelevant. Even if Pipes subjectively believed his untrue statements, those untrue statements failed to provide substantial assistance to the government.

9. Without intending a criticism of anyone, I wish to make clear that this court expects all lawyers to reveal the precise nature of plea agreements when the court is considering whether to accept a plea of guilty. The knowing failure to reveal an agreement between the parties, particularly one that is contrary to the information provided

In finding that Pipes was not truthful, I am particularly persuaded by three factors. Initially, as mentioned earlier, the story that Pipes and Waldrip told was implausible for a variety of reasons. For example, when traveling from California to Oklahoma, one would not normally meander through Utah and eastern Nebraska. Still further, Waldrip, when called as a witness at the evidentiary hearing, refused to testify. Thus, Pipes has no corroboration for his story. Finally, Green's story was corroborated. For example, Green stated that he would not return to Oklahoma because he feared that he would be killed, and other Oklahoma conspirators confirmed that Green's fears were fact-based.

### C. The Other Arguments Advanced by Pipes Lack Merit

Pipes, through his able lawyer, advances a number of other arguments to persuade me that he is entitled to the departure motion. I have considered each of those arguments, and find none of them have merit. However, two of these arguments warrant a brief response.

Pipes argues that Bruce Gillan, one of the Nebraska prosecutors, promised his lawyer a departure motion.[9] Thus, Pipes argues that I can infer a lack of rationality from the government's failure to file a motion that Gillan promised would be made. The short answer to Pipes' argument is that Gillan did not promise a departure motion. Rather, I find that Gillan stated only that if helpful information was provided, the government would consider filing such a motion.[10] To the extent that Mr. Berry, Pipes' lawyer, understood otherwise, I find that he was mistaken.

the court in the petition to enter a plea of guilty, will not be tolerated.

10. Even if Gillan made such an unconditional promise on December 21, 1995, the January 12, 1996, plea agreement (filing 68) canceled that promise. Indeed, Pipes told me on January 18, 1996, that there were no promises of any kind except for those set forth in the plea agreement. (Filing 69, Tr. 20: 24–25.) As noted earlier, the plea agreement (filing 68) made no promise beyond the government's agreement to consider his cooperation. (*Id.,* attached plea agreement at ¶ 5B.)

Pipes next argues that Richard Rothrock, another government prosecutor, agreed that Waldrip had played a reduced role in the offense (Ex. 102; Tr. 13: 9–18), entitling Waldrip to a downward adjustment for his role in the offense. From this fact, Pipes argues that the government must have believed Waldrip and Pipes and not Green. Consequently, Pipes argues that I should hold that alleged inconsistency against the government when evaluating the rationality of the decision not to file a motion for departure.

It is true that the government agreed that Waldrip (and Pipes)[11] were entitled to a reduced role in the offense and thus a reduction in the total offense level.[12] However, it is also true that the government unswervingly maintained its position that Waldrip's assistance was not substantial.[13]

It would be unwise to draw an adverse inference against the government on the departure question because of its position on the role-reduction issue. The government gave Waldrip and Pipes the benefit of the doubt for role-reduction purposes, but not for departure purposes. Since role in the offense and substantial assistance involve quite different legal and factual issues, the government's leniency for role-reduction purposes does not prove lack of rationality on the departure question.

### III. SUMMARY

After careful consideration of the evidence presented during a two-day evidentiary hearing, I will deny Pipes' motion to compel the government to file a motion for downward departure. Because Pipes' information was not helpful to the investigation or prosecution of individuals in Oklahoma or Nebraska, the government's decision not to file the departure motion was rationally related to the substantial assistance departure statutes and guidelines. Furthermore, Pipes' statements were not truthful.

Accordingly,

IT IS ORDERED that:

1. Pipes' motion for downward departure is denied.

2. By separate document, the court will schedule the resentencing of Pipes which is required by the Court of Appeals' vacation of the earlier sentence.

---

11. *See* Pipes' Presentence Investigation Report. (Filing 117 ¶ 25) (granting Pipes a four-point reduction for role in the offense).

12. The government also sought to enhance Waldrip's sentence as a career offender. In addition, the government submitted an oral motion for upward departure because of Waldrip's allegedly excessive criminal history.

13. On the departure question, and during questioning by the court at Waldrip's sentencing, Mr. Rothrock made clear that the only thing he could tell the court was that Waldrip had given information against Green that the government had considered. (Ex. 102, Tr. 12: 19–13: 4.) He refused to agree that Waldrip's information was useful in the Oklahoma prosecution of Green. (*Id.*)